UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. S2-4:19CR00211 RLW ) |
| MAURICE LEE, a/k/a "M1," | ) ) ) |
| Defendant. | ) |

## GUILTY PLEA AGREEMENT

Come now the parties and hereby agree, as follows:

### 1. PARTIES:

The parties are the defendant Maurice Lee, represented by defense counsel N. Scott Rosenblum and Greg Wittner, and the United States of America (hereinafter "United States" or "Government"), represented by the Office of the United States Attorney for the Eastern District of Missouri. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri. The Court is neither a party to nor bound by this agreement.

### 2. GUILTY PLEA:

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for the defendant's voluntary waiver of indictment and plea of guilty to a four-count Information, the government agrees that no further federal prosecution will be brought in this District relative to the defendant's participation in a drug conspiracy; conspiracy to possess, brandish and discharge firearms in furtherance of that drug conspiracy; and discharge of firearms in furtherance of that

1

drug conspiracy where death resulted, which specifically occurred on or about May 8, 2017 and June 30, 2017 of which the United States is aware at this time.

In addition, the parties agree that the U.S. Sentencing Guidelines Total Offense Level analysis agreed to by the parties herein is the result of negotiation and led, in part, to the guilty plea. The parties further agree to make a joint sentencing recommendation of 240 months imprisonment and that all counts run concurrent to each other.

### 3. ELEMENTS:

As to the offense in **Count One** of the Information, the Defendant admits to knowingly violating Title 21, United States Code, Sections 841(a)(1) and 846, and admits there is a factual basis for the plea and further fully understands that the elements of the crime are as follows:

(1) Two or more people reached an agreement to commit the crime of distributing and possessing with intent to distribute fentanyl;

(2) The Defendant voluntarily and intentionally joined in the agreement;

(3) At the time the Defendant joined in the agreement, the Defendant knew the purpose of the agreement; and

(4) The amount of fentanyl involved in the conspiracy attributable to the defendant, as a result of his own conduct and the conduct of others reasonably foreseeable to the defendant was 400 grams or more.

As to **Count Two**, the Defendant admits to knowingly violating Title 21, United States Code, Sections 841(a)(1) and 846, and admits there is a factual basis for the plea and further fully understands that the elements of the crime are as follows:

(1) Two or more people reached an agreement to commit the crime of distributing and possessing with intent to distribute methamphetamine;

(2) The Defendant voluntarily and intentionally joined in the agreement;

(3) At the time the Defendant joined in the agreement, the Defendant knew the purpose of the agreement; and

(4) The amount of actual methamphetamine involved in the conspiracy attributable to the defendant, as a result of his own conduct and the conduct of others reasonably foreseeable to the defendant was 50 grams or more.

As to **Counts Three and Four,** the Defendant admits to knowingly violating Title 18, United States Code, Section 924(o) and admits there is a factual basis for the plea and further fully understands that the elements of the crime are as follows:

(1) On or between May 8, 2017 and June 30, 2017, two or more people reached an agreement to commit the crime of possession of a firearm in furtherance of drug trafficking:

(2) The defendant voluntarily and intentionally joined in the agreement;

(3) At the time the defendant joined in the agreement, the defendant knew the purpose of the agreement; and

(4) While the agreement was in effect, a person or person who had joined in the agreement knowingly did one or more acts for the purpose of carrying out or carrying forward the agreement.

### 4. FACTS:

The parties agree that the facts in this case are as follows and that the government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be

3

considered as relevant conduct pursuant to Section 1B1.3:

## The Conspiracy to Distribute Narcotics and Possess Weapons

Beginning at a date unknown but at least approximately 2017, Maurice Lee, a/k/a "M1" (hereafter "Lee" or "defendant"), Darryl Moore, a/k/a "Lil Darryl" (hereafter "Moore") and others both known and unknown began to distribute large quantities of fentanyl and "Ice" (crystal methamphetamine) in the Eastern District of Missouri. Moore's source of supply was Juan Jose Gonzalez, a/k/a "Poncho" (hereafter "Gonzalez"), whom Moore met in Arizona. Defendant Jermaine Weaver, a/k/a "Twin" would assist Moore with transportation and financing. Moore would in turn supply Lee with bulk quantities of fentanyl and Ice. Lee would then have the raw fentanyl "whipped up" by stretching the raw fentanyl with a cutting agent (mainly Dormin). Grinders and blender were used to mix the fentanyl and Dormin, which was then scraped into empty capsules sitting in a pill press or tray. Scales were used to weigh the drugs. The capsules would then be placed in plastic bags. The Ice was sold in bulk quantities, primarily to one customer, who in turn would redistribute the Ice.

At the height of the conspiracy, Lee utilized a minimum of nine co-conspirators to distribute the fentanyl to customers. On average, the conspiracy would distribute over 20,000 doses or capsules (commonly known as "beans") of fentanyl per week. Distribution occurred through the use of "runners" – Christopher Warlick, a/k/a "White Boy" (hereafter "Warlick"), Norris Douglas, Jr., a/k/a "Slugga" (hereafter "Douglas"), Mikell Rayford, a/k/a "Killer Kelz" (hereafter "Rayford"), Sherod Tucker, a/k/a "Big Dog" (hereafter "Tucker"), Jerry Streeter, Jr., a/k/a "JTrayz" (hereafter "Streeter"), Jerome Fisher, a/k/a "LB" (hereafter "Fisher"), Charles Guice, a/k/a "Chuck" (hereafter "Guice"), Maricus Futrell, a/k/a "Rukus" (hereafter "Futrell")

4

and Delvin Bost, a/k/a "Deezy" (hereafter "Bost"). The runners would get a supply of fentanyl capsules from either Lee, Ramico Adams, a/k/a "Chico (hereafter "Adams") or Jalisa Johnson (hereafter "Johnson"). Adams assisted Lee in keeping track of the amount of capsules distributed and the amount of money due back to Lee. Johnson would supply or resupply runners with fentanyl and collect money at the end of the day. Tucker and/or Warlick were skilled at stretching the fentanyl for the drug trafficking organization (DTO), in order to increase profit.

The runners worked in groups and typically worked out of one or two vehicles at a time. All of them were armed with semi-automatic weapons, both handguns and assault rifles. Some of the runners were also considered to be "muscle" for the DTO and were willing to use violence, in order to protect themselves, the drugs and the money. Violence was also used to intimidate rival gangs and drug distributors who were referred to by Lee and members of his DTO as "Goofies." Lee knowingly conspired with Warlick, Futrell, Streeter, Fisher, Rayford, Guice, Douglas and others, both known and unknown, to possess firearms in furtherance of his drug trafficking activities. It was common knowledge that a standing bounty existed for the killing of any Goofy, in an amount anywhere from $5,000 to $15,000.

### Acts in Furtherance of the Conspiracy

On May 8, 2017 one or more co-conspirators were trying to confirm that a bounty was still being offered for the death of A.N. Lee considered A.N. a "Goofy." After it was communicated that the bounty was still being offered, co-defendants Fisher, Guice, Tremayne Silas (hereafter "Silas") and others unknown armed themselves and actively sought out A.N., who was drag racing in the City of St. Louis. After locating A.N. and confirming the bounty, Fisher, Guice, Silas and others known and unknown drove in two vehicles to a location where

5

A.N. was driving with a passenger. After boxing in Noodel, the co-conspirators jumped out of their vehicles and opened fire on A.N.'s vehicle. More than 100 rounds of ammunition were fired, scattering shell casings over the street. A.N. was struck in the head with a bullet and collapsed. His passenger climbed over his body, returned fire and managed to escape. He drove to a firehouse for assistance. A.N. was then transported to a hospital where he was pronounced dead due to a gunshot wound to his head.

Fisher and Guice disposed of their murder weapons after the killing of A.N. however Silas kept the automatic rifle he had used in the shooting. That rifle was eventually seized from Silas following a high-speed chase when Silas was arrested by the St. Louis City Police in January, 2018. Ballistics confirmed that the weapon seized from Silas in January 2018 matched several shell casings found at the scene of A.N.'s murder. Silas later admitted his involvement in the shooting death of A.N. and confirmed that Fisher and Guice were also present. An eyewitness to the murder identified Silas and Fisher as shooters. A forensic analysis of Fisher's cell phone, which was seized from him following his arrest in March, 2019, revealed text communications on the day of A.N.'s murder. These communications confirmed that Fisher and others were actively looking for A.N. in the area of Branch and Ninth Street, in the City of St. Louis.

Fisher: "Wtw" (What's the word)

Donnell: "We at candy bar"

Fisher: "Alexz at da rallys"

Donnell: "Who seen wm"

Donnell: "Em"

6

Fisher: "Smh (shake my head) mnn we gone miss the nigga"

Donnell: "No we aint nigga"

Fisher: "Den we already been on this lot 20 mins"

Donnell: "They At the truck stop now"

Donnell: "Got my eyes on em"

A forensic analysis of Silas' phone confirmed that on May 8, 2017 a group text, which included Lee, Silas, Warlick, Fisher, Guice and others, contained messages in which the co-conspirators discussed how Noodel had been spotted, describing his car, and discussing plans to find Noodel and do him harm:

From L.B. Blood (Fisher): "They down dur raceing at da truck stop"

From K.J.: "In the Audi"

From L.B. Blood (Fisher): "Yea"

From K.J.: "Damn this a B the best time"

From My Son (Warlick): "BOX"

From K.J.: "Donnie right next to em ina SS"

From My Son (Warlick): "We need to be in der with Donnie"

From K.J.: "I swear to god we would of torch that mufuka"

From Silas: "Where mts at I'm free outside n on it"

From Chuck (Guice): "4door Audi black"

From L.B. Blood: "We already hip s7"

From Chuck (Guice): "Crazy he in sum hella fast"

7

On June 30, 2017, K.D. a/k/a "Red Dot" was shot and killed in the City of St. Louis. K.D. was found in the street suffering from multiple gunshot wounds. Approximately twenty-five 9mm shell casings were recovered at the scene. Witnesses described seeing the suspect get out of a gold Buick, chase K.D. down the street, shoot him and after K.D. fell, witnesses told the police that the shooter fired additional rounds into the victim. Witnesses described the shooter as a tall, slender black male with dread locks, wearing a t-shirt. After the shooting, witnesses described for police how the suspect got back in the gold Buick and drove off. One of the eyewitnesses to the murder later identified co-conspirator Michael Johnson, a/k/a/ "Beezy" as the person who shot and killed K.D. Michael Johnson's fingerprints were found on the gold Buick used in the murder, which was recovered on July 3, 2017. The vehicle had been reported stolen from Creve Coeur on June 20, 2017.

On the day K.D. was killed, co-conspirator Delvin Bost, a/k/a "Deezy" called Maurice Lee, wanting to confirm that Lee's bounty was still being offered for the killing of Red Dot, who was considered a "Goofy." After Lee confirmed the bounty, word spread via social media that K.D., a/k/a "Red Dot" had been killed. Bost met with Lee at a residence in the Northwinds Apartment complex in order to collect the bounty. Bost claimed credit for the killing of Red Dot. Witnesses observed Lee count out the money to Bost, who in turn paid Michael Johnson for the murder.

By this plea agreement, Defendant acknowledges and understands that victims A.N. and K.D. were shot and died as a result of gunshot wounds and that the discharge of one or more firearms by Defendant's associates were committed during the course and in furtherance of the group's drug conspiracy.

8

The parties stipulate and agree that the amount of narcotics distributed by Lee is not subject to precise calculation but for purposes of relevant conduct, the parties stipulate that Lee is responsible for at least 4 kilograms but less than 12 kilograms of fentanyl and at least 500 but less than 1.5 kilograms of actual methamphetamine.

### 5. STATUTORY PENALTIES:

The defendant fully understands that the maximum possible penalty provided by law for the crimes to which the defendant is pleading guilty is:

**Count 1:** imprisonment of not less than 10 years nor more than life, a fine of not more than $10,000,000, or both such imprisonment and fine. The Court shall also impose a period of supervised release of not less than 5 years.

**Count 2:** imprisonment of not less than 10 years nor more than life, a fine of not more than $10,000,000, or both such imprisonment and fine. The Court shall also impose a period of supervised release of not less than 5 years.

**Counts 3 and 4:** imprisonment of not more than 20 years, a fine of not more than $250,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than 3 years.

### 6. U.S. SENTENCING GUIDELINES: 2021 MANUAL:

The defendant understands that this offense is affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal History Category. The parties agree that he following are the U.S. Sentencing Guidelines Total Offense Level provisions that apply.

a. **Chapter 2 Offense Conduct:**

### Count One

**(1) Base Offense Level:** The parties agree that the base offense level is 34, as found in Section 2D1.1(c)(3), as the amount of fentanyl attributable to defendant was at least 4 kilograms but less than 12 kilograms.

**(2) Specific Offense Characteristics:** None, pursuant to Section 2K2.4, Application Note 4.

**b. Chapter 3 Adjustments:** 3 levels are added as the defendant was a manager or supervisor and the criminal activity involved five or more participants, pursuant to Section 3B1.1(b)

### Count Two

**(1) Base Offense Level:** The parties agree that the base offense level is 34, as found in Section 2D1.1(c)(3), as the amount of actual methamphetamine attributable to defendant was at least 500 grams but less than 1.5 kilograms.

**(2) Specific Offense Characteristics:** None, pursuant to Section 2K2.4, Application Note 4.

**b. Chapter 3 Adjustments:** 3 levels are added as the defendant was a manager or supervisor and the criminal activity involved five or more participants, pursuant to Section 3B1.1(b).

### Counts Three and Four

**(1) Base Offense Level:** The parties agree that the base offense level is found in Section 2K2.1 and depends on the nature of the firearm, the defendant's criminal history and other factors therein, including whether or not the use of the firearm resulted in death.

**(2) Specific Offense Characteristics:** The parties agree that 4 levels should be added pursuant to Section 2K2.2(b)(6)(B) because defendant conspired to possess or transfer a firearm with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, to-wit: drug trafficking and discharge of a firearm in furtherance of drug trafficking where death results and the death being a murder as defined by Title 18, United States Code, Section 1111.

Accordingly, application of the Sentencing Guidelines could include the application of Section 2K2.1(c)(1)(B) which provides that an offense involving first degree murder has a base offense level of 43.

**(3) Chapter 3 and 4 Adjustments: (1) Acceptance of Responsibility:** As to Counts One and Two, the parties agree that three levels should be deducted pursuant to Section 3E1.1(a) and (b), because the defendant has clearly demonstrated acceptance of responsibility and timely notified the government of the defendant's intention to plead guilty. The parties agree that the defendant's eligibility for this deduction is based upon information presently known. If subsequent to the taking of the guilty plea the government receives new evidence of statements or conduct by the defendant which it believes are inconsistent with defendant's eligibility for this deduction, the government may present said evidence to the court, and argue that the defendant should not receive all or part of the deduction pursuant to Section 3E1.1, without violating the plea agreement. Pursuant to Section 2K2.4(b) and Application Note 5, Chapters Three and Four do not apply as to Counts Three and Four, so as to Counts Three and Four, Defendant is not entitled to an acceptance of responsibility reduction under Section 3E1.1.

11

**(4) Estimated Total Offense Level:** The parties estimate that the total offense level for Counts One and Two is 34.

**d. Criminal History:** The determination of the defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the finding of the Presentence Report as to the defendant's criminal history and the applicable category. The defendant's criminal history is known to the defendant and is substantially available in the Pretrial Services Report.

**e. Effect of Parties' U.S. Sentencing Guidelines Analysis:** The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement.

## 7. WAIVER OF APPEAL AND POST-CONVICTION RIGHTS:

**a. Appeal:** The defendant has been fully apprised by defense counsel of the defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

**(1) Non-Sentencing Issues:** The parties waive all rights to appeal all non jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery and the guilty plea, the constitutionality of the statute(s) to which defendant is pleading guilty and whether defendant's conduct falls within the scope of the statute(s).

**(2) Sentencing Issues:** In the event the Court accepts the plea, accepts the U.S. Sentencing Guidelines Total Offense Level agreed to herein, and, after determining a Sentencing

Guidelines range, sentences the defendant consistent with the joint recommendation of 240 months, concurrent on all counts, the defendant hereby waives all rights to appeal all sentencing issues other than Criminal History, but only if it affects the Base Offense Level or Criminal History Category. Similarly, the Government hereby waives all rights to appeal all sentencing issues other than Criminal History, provided the Court accepts the plea, the agreed Total Offense Level and sentences the defendant consistent with the joint recommendation of 240 months, concurrent on all counts.

**b. Habeas Corpus:** The defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

**c. Right to Records:** The defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

**8. OTHER:**

**a. Disclosures Required by the United States Probation Office:** The defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the government.

**b. Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies:**

13

Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against the defendant.

 **c. Supervised Release:** Pursuant to any supervised release term, the Court will impose standard conditions upon the defendant and may impose special conditions related to the crime defendant committed. These conditions will be restrictions on the defendant to which the defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require the defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release. The defendant understands that parole has been abolished.

 **d. Mandatory Special Assessment:** Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count for a total of $400, which the defendant agrees to pay at the time of sentencing. Money paid by the defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

 **e. Possibility of Detention:** The defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

 **f. Fines, Restitution and Costs of Incarceration and Supervision:** The Court may impose a fine, costs of incarceration and costs of supervision. The defendant agrees that any fine imposed by the Court will be due and payable immediately.

 **g. Forfeiture:** The defendant knowingly and voluntarily waives any right, title, and interest in all items seized by law enforcement officials during the course of their

investigation, whether or not they are subject to forfeiture, and agrees not to contest the vesting of title of such items in the United States. The defendant agrees that said items may be disposed of by law enforcement officials in any manner.

### 9. ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS:

In pleading guilty, the defendant acknowledges, fully understands and hereby waives his rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the government to prove the elements of the offenses charged against the defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The defendant further understands that by this guilty plea, the defendant expressly waives all the rights set forth in this paragraph.

The defendant fully understands that the defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. The defendant's counsel has explained these rights and the consequences of the waiver of these rights. The defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The defendant is fully satisfied with the representation received from defense counsel. The defendant has reviewed the government's evidence and discussed the government's case and

15

all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the defendant has requested relative to the government's case and any defenses.

The guilty plea could impact defendant's immigration status or result in deportation. In particular, if any crime to which defendant is pleading guilty is an "aggravated felony" as defined by Title 8, United States Code, Section 1101(a)(43), removal or deportation is presumed mandatory. Defense counsel has advised the defendant of the possible immigration consequences, including deportation, resulting from the plea.

## 10. VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT:

This document constitutes the entire agreement between the defendant and the government, and no other promises or inducements have been made, directly or indirectly, by any agent of the government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the defendant states that no person has, directly or indirectly, threatened or coerced the defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The defendant further acknowledges that this guilty plea is made of the defendant's own free will and that the defendant is, in fact, guilty.

## 11. CONSEQUENCES OF POST-PLEA MISCONDUCT:

After pleading guilty and before sentencing, if defendant commits any crime, other than minor traffic offenses, violates any conditions of release that results in revocation, violates any

16

term of this guilty-plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United States, at its option, may be released from its obligations under this agreement. The Government may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

**12. NO RIGHT TO WITHDRAW GUILTY PLEA:**

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the defendant understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement which deal with charges the government agrees to dismiss or not to bring.

5/2/2023
Date

PAUL J. D'AGROSA (#36966MO)
Assistant United States Attorney

4·28·23
Date

MAURICE LEE, II
Defendant

5/5/23
Date

GREG WITTNER/N. SCOTT ROSENBLUM
Attorneys for Defendant

17